797 A.2d 250

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Roger JUDGE, Appellant.**

Supreme Court of Pennsylvania.

Submitted July 23, 2001.

Decided May 23, 2002.

378

Anne L. Saunders, Ronald Greenblatt, Kathryn R. Swedlow, Alexandria B. Fensterer, Philadelphia, for appellant, Roger Judge.

Catherine Marshall, Philadelphia, Robert A. Graci, Harrisburg, for appellee, the Com. of PA.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice NEWMAN.

Roger Judge (Appellant) appeals from an Order of the Court of Common Pleas of Philadelphia County (PCRA court), which dismissed the Post Conviction Relief Act[1] (PCRA) Petition of Appellant. Based upon the reasons set forth below, we affirm.

## FACTS AND PROCEDURAL HISTORY

In April of 1987, Appellant was tried for the murders of Christopher Outterbridge (Outterbridge) and Tabatha Mitchell. The evidence submitted at trial, as summarized by this Court on direct review, demonstrated that:

On the evening of September 13, 1984, Christopher Outterbridge was engaged in a conversation with his girlfriend across the street from his house at 110 West Wyoming Avenue in Philadelphia. Appellant, Roger Judge, approached the couple and began taunting Christopher. Christopher informed appellant that he did not want to fight, and as he turned to walk away, appellant struck him in the face. In response, Christopher punched appellant, knocking him to the ground; Christopher then retreated to his home. Appellant chased Christopher into his home, where appellant was confronted by Christopher's older brother, Kenneth Outterbridge. After a brief scuffle with Kenneth, appellant left.

1. 42 Pa.C.S. § 9541 *et seq.*

Several times that evening, appellant returned to the Outterbridge home. On one occasion appellant told Kia Outterbridge, Christopher's younger sister, that he would be back to kill Christopher. On another occasion, appellant returned to the Outterbridge home with a friend and both appeared to be concealing weapons. Afraid of a confrontation, Christopher sought assistance from his mother, who went out on the porch to confront the men. Appellant repeatedly ordered Ms. Outterbridge to send her son outside, but Ms. Outterbridge refused, and threatened to telephone the police. Appellant left, but informed Ms. Outterbridge that he intended to return.

On September 14, 1984, the following evening, at approximately 11:45 p.m., Christopher and his friends were returning home from a nearby sandwich shop, when one of his friends briefly saw the appellant near the Outterbridge home. When the group arrived at the Outterbridge home, they joined Christopher's sister Kia on the front porch. Moments later, appellant jumped out of the bushes, aimed his gun at Christopher, and fired five shots at the teenagers gathered on the porch. Christopher Outterbridge was shot in the back, and a friend of Christopher's sister, fifteen year old Tabatha Mitchell, was shot in the chest.

After emptying his handgun of ammunition, appellant fled on foot in the direction of Marvine Street, but reversed direction when he realized that police vehicles were arriving from that direction. As he passed back in front of the Outterbridge house, one of Christopher's friends, Calvin Whitaker, unsuccessfully attempted to apprehend appellant. Appellant fled down a back alley as Calvin repeatedly called out appellant's street name, "Dobe."

A police officer arrived on the scene moments later, after hearing gunshots from the direction of the Outterbridge house. Christopher ran down the steps bleeding profusely from his neck and mouth and begged to be taken to the hospital; Calvin stood on the porch waving his arms and shouting "It was Dobe"; and Tabatha lay on her back on the porch with a bullet hole in her chest.

The officer immediately called for police assistance and Christopher and Tabatha were transported to the hospital. While enroute to the hospital, Christopher, though barely alive, managed to tell police that "Dobe" had shot him. Soon after arriving at the hospital, both victims were pronounced dead. Christopher died from a single gunshot wound; the bullet entered the right side of his back, traveled through his right lung, through a large blood vessel, and then lodged in the soft tissue of the right side of his neck. Tabatha Mitchell's life was also ended by a single gunshot wound; the bullet entered her abdomen, traveled through her liver and pancreas, grazed her backbone, and damaged two major blood vessels. The bullet finally lodged in the soft tissue of her back. According to the Medical Examiner, the manner of both deaths was homicide.

Shortly after the shooting, officers established a crime scene and began an investigation. Two .32 caliber projectiles were recovered; one from the porch of the Outterbridge home, the other from a neighbor's property. The following day, several of Christopher's friends conducted an informal search of the back alley down which appellant had fled, and recovered the hooded jacket and sweat pants which appellant had discarded during his flight the night of the shooting.

An intensive search for appellant was conducted by the police, based upon the teenagers' eye-witness identifications of the assailant. Police apprehended appellant two and one-half weeks later with the help of Angela Smith. She had been with appellant the night of the shooting. She testified that sometime between 11:00 p.m. and 12:00 a.m. appellant left stating that he had something to do. (N.T. 4/9/87, pp. 96, 115, 128). When appellant returned approximately one hour later he was out of breath, wet and wearing different clothes. She overheard appellant discussing the incident with his friend. Later, while driving with some others to East Falls, Ms. Smith asked appellant why he had killed "those two people," and he responded that he would tell her after he finished smoking a joint. (N.T. 4/9/97, p. 98).

Although appellant never provided her with the requested information, he did tell her that he had disposed of the gun at the house next door to where the murders took place. (N.T. 4/9/87, pp. 98–99).

Approximately two weeks later, Ms. Smith received a telephone call from appellant. He informed her that he was in New Jersey waiting for his friends to bring him some money so that he could purchase a car and a bullet-proof vest. She asked him if he planned on turning himself in and he told her that that would be a "dumb move." (N.T. 4/9/87, p. 102). Subsequent to this conversation, Ms. Smith was interviewed by the police. The homicide detectives instructed her to call them if she heard from appellant again. On October 2, 1984, Ms. Smith received three telephone calls from appellant informing her that he was on his way to see her and requested directions. She immediately contacted the police, enabling them to apprehend appellant as soon as he entered Ms. Smith's residence. Appellant was arrested, given his *Miranda* warnings, and then made an inculpatory statement to the investigating officer, that it "[d]on't matter if I tell you why I did it or not, I know I'm done." (N.T. 4/10/87, p. 48).

On November 23, 1984, detectives recovered a rusted .32 caliber Smith and Wesson five-shot revolver from deep in the bushes in front of a basement window at 1114 West Wyoming Avenue. A microscopic comparison of the markings on the revolver and the bullets previously recovered, led a firearms expert to positively conclude, that three of the four bullet specimens came from the revolver found in the neighbor's yard. [There were four bullets recovered; one from the porch of the Outterbridge home, one from the neighbor, and one from each of the victim's bodies. The fourth specimen was too mutilated to make a conclusive determination.]

At trial, appellant testified that he was with Angela Smith and five other people at the time the murders took place, and therefore could not have committed the murders which occurred at 11:49 p.m. However, appellant failed to produce

any alibi witnesses, claiming that the District Attorney's office had intimidated them. (N.T. 4/13/87, pp. 49–51, 60, 70). Appellant admitted that he knew he was wanted by the police, even before the arrest and search warrants were issued, but hid from them in order to conduct his own investigation of the crime. His investigation failed to produce any exculpatory evidence and/or another suspect for the crime.

*Commonwealth v. Judge*, 530 Pa. 403, 609 A.2d 785, 787–89 (1992) (footnotes omitted).

The jury convicted Appellant on two counts of murder of the first degree [2] and one count of possession of an instrument of a crime [3] on April 15, 1987. Following the penalty hearing, the jury found the following aggravating circumstances with regard to the murders of both victims: (1) the Appellant knowingly created a grave risk of death to another person in addition to the victim of the offense,[4] and (2) Appellant had a significant history of felony convictions involving the use or threat of violence to the person.[5] Additionally, with regard to the murder of Outterbridge, the jury found as an aggravating circumstance that Appellant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or Appellant was undergoing a sentence of life imprisonment for any reason at the time of the offense.[6] The jury found one mitigating circumstance with regard to both murders, which was that Appellant was under the influence of extreme mental or emotional disturbance.[7] After unanimously concluding that the aggravating circumstances outweighed the sole mitigating circumstance, the jury sentenced Appellant to death for each of the first degree murder convictions.

**2.** 18 Pa.C.S. § 2502(a).

**3.** 18 Pa.C.S. § 907(b).

**4.** 42 Pa.C.S. § 9711(d)(7).

**5.** 42 Pa.C.S. § 9711(d)(9).

**6.** 42 Pa.C.S. § 9711(d)(10).

**7.** 42 Pa.C.S. § 9711(e)(2).

384

Appellant filed Post–Trial Motions, which the trial court denied on June 12, 1987. After denying these motions, the trial court formally sentenced Appellant to death for each of the two murders and a consecutive two and one-half to five years imprisonment for the possession of an instrument of a crime charge.

On June 14, 1987, only two days after sentencing, Appellant escaped from custody. Appellant had been unsuccessful during an earlier escape attempt. Then, on August 11, 1987, while a fugitive, Appellant filed a *pro se* Notice of Appeal from his death sentences.

Subsequently, Canadian authorities arrested Appellant on June 15, 1988, for robberies that he had committed in Canada. Canadian courts convicted Appellant of two counts of robbery and sentenced Appellant to two concurrent ten-year terms of imprisonment. Thereafter, pursuant to a Treaty between Canada and the United States, Canada refused to extradite Appellant to Pennsylvania.[8]

On May 18, 1992, while Appellant remained in Canadian custody, we issued our Opinion affirming his convictions for murder of the first degree and sentences of death. *See Judge*, 609 A.2d at 791. This Court declined to address claims raised by Appellant after concluding that he had forfeited his right to review by fleeing the jurisdiction; however, due to the severity and finality of the sentence of death, this Court examined

8. As we stated in the direct appeal of this case:
   Pursuant to Article 6 of the extradition agreement between the United States and Canada, appellant cannot be extradited to Pennsylvania, because first degree murder is not punishable by death in Canada. [ FN3] Treaty on Extradition, Dec. 3, 1971; amended June 28, 1974, July 29, 1974, United States–Canada, 27 U.S.T. 983, T.I.A.S. No. 8237; *Criminal Code*, R.S.C., c. C-46, s. 235(1).
      FN3. Article 6 provides: "When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed."
   *Judge*, 609 A.2d at 786.

several areas as mandated by the existing Sentencing Code.[9] *Id.* at 786. Consequently, we held that sufficient evidence existed to convict Appellant of both first degree murder charges; the sentences of death were not the product of passion, prejudice, or any other arbitrary factor; the evidence supported the finding of at least one aggravating circumstance; and the sentences were not excessive or disproportionate to the penalty imposed in similar cases.[10] *Id.* at 787–91.

While still in Canada, Appellant filed a *pro se* Petition for relief under the PCRA on January 14, 1997. On August 9, 1998, Canada deported Appellant to New York. New York then extradited Appellant to Pennsylvania.[11] On February 17, 1999, counsel filed an amended PCRA Petition on the behalf of Appellant. The Commonwealth responded and filed a Motion to Dismiss the amended Petition on June 17, 1999. The PCRA court granted the Motion to Dismiss on July 21, 1999, without holding an evidentiary hearing on the merits. In a dictated Opinion on the record, the court noted that it dismissed Appellant's Petition in light of our decision in *Commonwealth v. Kindler*, 554 Pa. 513, 722 A.2d 143 (1999). (N.T. 7/21/99, at 30–31.) Appellant then appealed to this Court.

## DISCUSSION

Appellant raises several claims attacking his convictions and sentences; however, the only issue before us is whether the PCRA court correctly dismissed his Petition.[12] We conclude

9. 42 Pa.C.S. § 9711(h).

10. Mr. Chief Justice Zappala authored a Dissenting Opinion, which Mr. Justice Cappy joined. In his Dissenting Opinion, Mr. Chief Justice Zappala noted that it is improper to absolutely bar a fugitive from petitioning a court and attempting to show good cause for reinstating the appeal. *Judge*, 609 A.2d at 791 (Zappala, J., dissenting). Mr. Chief Justice Zappala also noted that because Appellant was beyond the jurisdiction of the court while in Canada, he would have simply quashed his direct appeal. *Id.*

11. The record is not clear on exactly what date Appellant returned to the Commonwealth. It appears that Appellant was in the custody of Pennsylvania by December of 1998.

12. We note that Appellant petitioned the lower court for only PCRA relief on several claims of error and did not seek reinstatement of his

that the PCRA court acted properly because Appellant is ineligible for PCRA relief.

■ The Commonwealth asserts that Appellant did not timely file his PCRA Petition, and therefore, the PCRA court

appellate rights. It is not surprising that Appellant did not seek reinstatement, as we reviewed his case on direct appeal; however, we declined to address the claims of error that he had waived. *See Judge,* 609 A.2d at 786–91. In his brief, Appellant includes the following Statement of Questions Involved:

1. Is Appellant entitled to relief from his death sentence because counsel was ineffective at the capital sentencing for failing to investigate, develop and present significant mitigating evidence?

2. Is Appellant entitled to relief because counsel failed to request, and the court failed to order, a competency evaluation when appellant manifested extreme mental and emotional disturbance during his guilt-stage testimony?

3. Is Appellant entitled to relief because the trial court provided a defective reasonable doubt instruction?

4. Is Appellant entitled to relief because the trial court failed to provide an adequate alibi instruction?

5. Is Appellant entitled to a new trial because the prosecution improperly exercised peremptory challenges in a racially discriminatory manner?

6. Is Appellant entitled to relief because his death sentence was a product of improper racial discrimination and violated the Pennsylvania capital sentencing statute, the Pennsylvania Constitution, and the United States Constitution?

7. Is Appellant entitled to a new sentencing hearing because the jury was improperly instructed that it had to unanimously find each mitigating circumstance before it could consider that circumstance in its sentencing decision?

8. Is Appellant entitled to relief because the sentencing jury was never instructed that, if sentenced to life, Appellant would be statutorily ineligible for parole?

9. Is Appellant entitled to relief because the "Proportionality Review" performed by the Pennsylvania Supreme Court did not provide him the meaningful appellate review mandated by 42 Pa.C.S. § 9711(h)(3)(iii) and state and federal constitutional law?

10. Is Appellant entitled to relief because the trial court improperly denied his request to allow retained counsel to enter his appearance at the time of post-verdict motions and sentence without holding a hearing and because appellant was denied his right to effective assistance of counsel?

11. Was prior counsel ineffective for failing to raise the issues presented in the PCRA petition at trial, in post-trial motions and on direct appeal?

12. Is Appellant entitled to relief from his conviction and sentence because of the cumulative effect of the errors?

Appellant's Brief at 2–3.

and this Court are without jurisdiction to address it.[13] The Commonwealth notes that when Appellant filed his PCRA Petition, he was in the custody of Canadian officials and beyond the jurisdiction of the PCRA court. The Commonwealth argues that when Appellant returned to the custody of Pennsylvania, and counsel filed an amended PCRA Petition, the time for filing had expired. Therefore, the Commonwealth claims that Appellant's Petition is untimely and for that reason was properly dismissed.

A prisoner must file his or her PCRA Petition within the time limits set forth in the PCRA in order for the court to have jurisdiction over the matter. 42 Pa.C.S. § 9545(b); *Commonwealth v. Gamboa–Taylor*, 562 Pa. 70, 753 A.2d 780, 783 (2000). If the judgment of a prisoner became final on or before the effective date of the amended PCRA, which is January 16, 1996, the prisoner's first Petition will be deemed timely if it is filed within one year of the effective date of the act. Section 3(1) of the Act of Nov. 17, 1995 (Spec.Sess. No. 1), P.L. 1118, No. 32; *Commonwealth v. Peterkin*, 554 Pa. 547, 722 A.2d 638, 641 (1998). The conviction of Appellant became final in 1992, therefore, he had to file his first PCRA Petition within one year of January 16, 1996. Appellant filed his first *pro se* PCRA Petition on January 14, 1997, within the one-year time period.

While a prisoner must file in a timely manner in order for the PCRA court to have jurisdiction, nothing in the language of the PCRA requires the prisoner be in the Commonwealth when he or she files a Petition. *See generally* 42 Pa.C.S. § 9545(b) (governing jurisdiction and proceedings); *Yarris*, 731 A.2d at 587 (stating that strict adherence to the

13. While the Commonwealth raises the timeliness issue for the first time on appeal to this Court, we will address it because the claim relates to our subject matter jurisdiction, and therefore cannot be waived. *See Commonwealth v. Pursell*, 561 Pa. 214, 749 A.2d 911, 913–14 (2000) (noting that this Court may address the timeliness of a Petition even if the lower court did not because timeliness presents a threshold question of whether the court had jurisdiction to grant relief); *Commonwealth v. Yarris*, 557 Pa. 12, 731 A.2d 581, 587 (1999) (holding that timeliness of a Petition implicates the jurisdiction of this Court and therefore we may consider the matter *sua sponte*).

statutory language of the PCRA is required); *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 303 (Pa.999), *cert. denied*, 528 U.S. 975, 120 S.Ct. 422, 145 L.Ed.2d 330 (1999) (same). The PCRA vests original subject matter jurisdiction over PCRA proceedings in the court of common pleas. 42 Pa.C.S. § 9545(a). In addition, by filing a Petition, the prisoner would consent to jurisdiction over his person. *See generally Wagner v. Wagner*, 564 Pa. 448, 768 A.2d 1112, 1120 (2001) (stating that "[i]t is well-settled that a party may either expressly or impliedly consent to a court's personal jurisdiction"). Therefore, under the PCRA and our precedent, the PCRA court had jurisdiction over the Petition of Appellant.

■ Contrary to the Commonwealth's assertions, section 9543 of the PCRA does not require a prisoner to be in the custody of the Commonwealth in order for the court to have jurisdiction. Section 9543 governs a prisoner's eligibility for relief, and provides in part:

(a) General rule.—To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

(1) That the petitioner has been convicted of a crime under the laws of this Commonwealth and is at the time relief is granted

(i) currently serving a sentence of imprisonment, probation, or parole for the crime;

(ii) awaiting execution of a sentence of death for the crime; or

(iii) serving a sentence which must expire before the person may commence serving the disputed sentence.

42 Pa.C.S. § 9543(a)(1). As we stated earlier, Appellant complied with the requirements of the PCRA when he filed his *pro se* Petition; consequently, the PCRA court had jurisdiction over the matter.[14]

14. To be eligible for relief under section 9543(a), a prisoner must satisfy the statutory requirements at both the time he or she files the Petition and at the time that relief is due. *Commonwealth v. Ahlborn*, 548 Pa. 544, 699 A.2d 718, 720 (1997). Appellant met the eligibility require-

Appellant asserts that the PCRA court erred in dismissing his Petition. He claims that the court incorrectly concluded that he had waived all review of his convictions and sentences by fleeing prior to direct appeal. Also, Appellant maintains that the PCRA court abused its discretion in failing to consider his claims. Appellant argues that the lower court should have considered his Petition for several reasons: his flight had no impact on the PCRA proceedings, he lacked the mental capacity to understand the consequences of his escape, and he has been in continual custody of authorities since his capture in Canada on June 15, 1988.

Neither the PCRA, nor its accompanying rules, address the effect of the fugitive status of a prisoner when filing a Petition.[15] In the direct review context, we have acknowledged an appellate court's discretion to dismiss the appeal of an active fugitive upon motion of the Commonwealth or by acting *sua sponte*. *In the Interest of J.J.*, 540 Pa. 274, 656 A.2d 1355, 1356–57 (1995) (plurality); *Commonwealth v. Passaro*, 504 Pa. 611, 476 A.2d 346, 348 (1984); *Commonwealth v. Tomlinson*, 467 Pa. 22, 354 A.2d 254 (1976) (per curiam). Our rules of appellate procedure provide that any party may move to continue generally or quash an appeal because the appellant is a fugitive. Pa.R.A.P.1972(6). The rationale behind dismissing the appeal of a fugitive rests upon the discretion of the

ments in section 9543. At the time that Appellant filed his first PCRA Petition, he was serving his Canadian sentence. Canada refused to release Appellant to the control of the United States and required him to serve his sentence before deporting him. Therefore, at the time that he filed his Petition, Appellant was serving a sentence that had to expire before he could begin his disputed sentence in Pennsylvania. *See* 42 Pa.C.S. § 9543(a)(1)(iii). In addition, at the time that the PCRA court addressed Appellant's Petition, Appellant was in the custody of the Commonwealth and awaiting the execution of the sentences of death for his crimes. *See* 42 Pa.C.S. § 9543(a)(1)(ii).

15. As we conclude that Appellant is ineligible for relief because he has failed to preserve his issues for collateral review, we decline to address the effect of Appellant's status as a fugitive when he filed his Petition. Such a discussion is best left for another day in light of the unique factual circumstances of this case, where Appellant filed while in the custody of another country and the Commonwealth did not seek dismissal of his PCRA Petition, and the lower court did not rule on such matter, until after he had returned to Pennsylvania.

court to refuse to hear the claim of a litigant, who has gone beyond the control of the court through an escape from custody, and may not be responsive to the judgment of the court. *Passaro,* 476 A.2d at 348. "While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims." *Id.* at 349 (quoting *Molinaro v. New Jersey,* 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970)). Flight does not act as a complete forfeiture of appellate rights, however, and "a fugitive who returns to court should be allowed to take the system of criminal justice as he finds it upon his return: if time for filing has elapsed he may not file; if it has not, he may." *Commonwealth v. Deemer,* 550 Pa. 290, 705 A.2d 827, 829 (1997) (rejecting the *per se* waiver rule from *Commonwealth v. Jones,* 530 Pa. 536, 610 A.2d 439 (1992)).

Recently, in *Commonwealth v. Kindler,* 554 Pa. 513, 722 A.2d 143 (1999)(hereinafter *Kindler II*), this Court held that a prisoner, who had been a fugitive in the past, was ineligible for PCRA relief. As *Kindler II* is instructive in the present case, we will discuss it in greater depth.

A jury convicted Joseph Kindler (Kindler) of first degree murder, kidnapping, and conspiracy and subsequently sentenced Kindler to death. While Kindler's Post–Verdict Motions were pending, he escaped from custody. The Commonwealth filed a Motion to Dismiss the Post–Verdict Motions due to the fugitive status of Kindler. Following a hearing, the trial court dismissed Kindler's motions after determining that he had waived his right to have these motions considered by fleeing. The court then deferred sentencing until Kindler was apprehended. Eventually, Kindler was arrested in Canada and returned to Pennsylvania. The trial court formally sentenced Kindler and he appealed to this Court.

In the Opinion Announcing the Judgment of the Court, Mr. Justice Papadakos, writing for the plurality, determined that the trial court had correctly dismissed Kindler's Post–Verdict Motions. *Commonwealth v. Kindler,* 536 Pa. 228, 639 A.2d 1 (1994), *cert. denied,* 513 U.S. 933, 115 S.Ct. 327, 130 L.Ed.2d

287 (1994) (hereinafter *Kindler I*).[16]  Accordingly, we conclud-
ed that the direct appeal came to us with no allegations of
error preserved.  *Id.* at 4. We then conducted a review as
mandated by the Sentencing Code, 42 Pa.C.S. § 9711(h), and
sustained Kindler's first degree murder conviction and sen-
tence of death.  *Id.* at 4–8.

Kindler then filed a PCRA Petition.  The PCRA court
dismissed the Petition and Kindler again appealed to our
Court.

In *Kindler II*, this Court affirmed the decision of the PCRA
court to dismiss Kindler's Petition after concluding that he
was ineligible for PCRA relief.  722 A.2d at 146.  First, we
held that the issue of whether the trial court had properly
dismissed Kindler's Post Verdict Motions was an issue previ-
ously litigated in *Kindler I*, and therefore not reviewable
under the PCRA.  *Id.* at 146–47.  Then, we stated that "[t]o
grant [Kindler] the relief he requests in his PCRA, an eviden-
tiary hearing on claims already *forfeited* by his flight from
captivity, would render meaningless all previous rulings of the
trial court and of this Court."  *Id.* at 148 (emphasis in the
original).  After noting that Kindler had failed to present a
reason to disregard the prior rulings, we said that:

> [I]t would be anomalous to permit Appellant to prevail on
> this claim and then to subject the trial court to a remand
> order requiring it to rule on the merits of these same
> [issues] which were raised, or which would have been raised,
> at an earlier time and which could have been addressed had
> Appellant demonstrated some kind of respect for the trial
> court and legal process.

*Id.* (quoting *Kindler I*, 639 A.2d at 4).

■  As we concluded in *Kindler II*, we hold that the PCRA
court in the present case did not err in dismissing Appellant's

---

**16.**  All six Justices that participated in the decision agreed that Kindler's
judgment of sentence should be affirmed.  While Mr. Chief Justice
Flaherty and Mr. Justice Cappy suggested in their Concurring Opinions
that the Post–Verdict Motions of a returned fugitive should be reinstat-
ed under certain circumstances, both agreed that the lower court
properly dismissed Kindler's Post–Verdict Motions due to his escape
and absence while his motions were pending.

Petition because he was ineligible for relief. Like Kindler and his absence during the pendency of his Post–Verdict Motions, Appellant forfeited his right to have his claims of error adjudicated on direct appeal due to his fugitive status during direct appeal proceedings. As did Kindler, Appellant comes to this Court without any issues preserved for collateral review. On direct review of this case, we correctly decided that Appellant waived his right to have his claims addressed. Our conclusion was based in part on the "longstanding and established principle of American law" that a court may dismiss the pending appeals of escaped prisoners. *Judge*, 609 A.2d at 786 (quoting *Passaro*, 476 A.2d at 348 (quoting *Estelle v. Dorrough*, 420 U.S. 534, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1975))). While we no longer view escape as a *per se* waiver of all appellate rights after the fugitive returns to the Commonwealth, the disposition in *Judge* was correct because Appellant had been a fugitive at the time of filing and still beyond our control when we disposed of the case. Appellant fails to demonstrate that any of his assertions of error in his PCRA Petition, all of which he could have raised on direct review, have not been waived by his flight. *See* 42 Pa.C.S. §§ 9543(a)(3) ("[t]o be eligible for relief ... the petitioner must plead and prove by a preponderance of the evidence ... that the allegation of error has not been previously litigated or waived") and 9544(b) ("an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding"). The PCRA states that it does not "provide a means for raising issues waived in prior proceedings," 42 Pa.C.S. § 9542, therefore, we refuse to permit Appellant to resurrect issues that were raised,[17] or which could have been raised and would have been addressed, on direct appeal, had Appellant demonstrated some kind of respect for the legal process.[18]

---

**17.** Counsel sought to raise several issues for review on direct appeal, however, because of the fugitive status of Appellant, we declined to address these claims. *Judge*, 609 A.2d at 786.

**18.** Appellant also argues that because this is a capital case, he should be given the benefit of the relaxed waiver rule. As noted in *Kindler II,*

## CONCLUSION

Appellant was ineligible for PCRA relief for the claims raised in his Petition. Accordingly, we affirm the decision of the PCRA court that dismisses Appellant's Petition.[19]

Chief Justice ZAPPALA and Justice NIGRO concur in the result.

relaxed waiver does not apply to Appellant's situation. 722 A.2d at 148 n. 13. In addition, Appellant claims that a failure by this Court to review his PCRA Petition will constitute a miscarriage of justice, which this Court has the power to remedy. There is no injustice in refusing to allow Appellant to revive on collateral review claims that he waived during his direct appeal.

19. The Prothonotary of the Supreme Court is directed to transmit the record to the Governor pursuant to 42 Pa.C.S. § 9711(i).